UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

WILLIAM J. KENNEDY,

        Plaintiff,

        v.                                                Case No. 20-C-1925

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

        Defendant.

---

## DECISION AND ORDER AFFIRMING THE COMMISSIONER'S DECISION

---

      Plaintiff William Kennedy filed this action for judicial review of a decision by the Commissioner of Social Security denying his applications for a period of disability and disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Kennedy asserts that the decision of the administrative law judge (ALJ) requires remand for a number of reasons. For the following reasons, the Commissioner's decision will be affirmed.

## BACKGROUND

      Kennedy filed applications for disability and disability insurance benefits and supplemental security income in April 2014 and August 2015, respectively, alleging disability beginning in October 2008. R. 278, 306. He listed chronic pain, neck injury and pain, fusion in his neck, muscle spasms, depression, and a pacemaker as the conditions limiting his ability to work. R. 328. His applications were denied initially and on reconsideration. Following an administrative hearing, ALJ Edward Studzinski issued a decision on October 31, 2016, and found that Kennedy was not under a disability at any time from October 7, 2008, through the date of the decision. R. 31–47. Kennedy filed a complaint in the United States District Court for the Eastern District of Wisconsin

seeking judicial review of the ALJ's decision. The matter was reversed and remanded for further proceedings on March 1, 2019. R. 981–86; *see Kennedy v. Berryhill*, No. 17-C-1630 (E.D. Wis.). Kennedy amended his alleged onset date to October 12, 2013, and ALJ Studzinski held a second administrative hearing on August 21, 2019. R. 922–65. Kennedy, who was represented by counsel, and a vocational expert (VE) testified.

At the time of the hearing, Kennedy was 54 years old. He testified that he was diagnosed with major depression after he tore his rotator cuff in August 2008. R. 927–28. Kennedy indicated that he experienced significant neck pain, depression, anxiety, and migraines. R. 928. He stated that his depression causes feelings of worthlessness and that his anxiety causes him to shake, stutter, and avoid talking to people. R. 928–29. Kennedy reported talking to a therapist every other week for a few years. R. 931. As to his physical impairments, Kennedy stated that his neck pain results in severe muscle spasms that make him feel like he is "getting choked." R. 933–34. He testified that the pain radiates up the left side of his neck and into his temple, occasionally causing him to experience earaches. R. 934. Kennedy reported taking various medications to help alleviate the pain and that he would also need to lay down for a few hours to recover from it. *Id.*

In a twenty-page decision dated November 1, 2019, the ALJ concluded that Kennedy was not disabled. R. 888–907. Following the Social Security Administration's (SSA) sequential evaluation process, the ALJ found that Kennedy met the insured status requirements of the Social Security Act through December 31, 2013, and that he had not engaged in substantial gainful activity since October 12, 2013, the amended alleged onset date. R. 890. Next, the ALJ noted that Kennedy had the following severe impairments: obesity; disorders of the back, neck, and shoulder with a history of cervical spine decompression and fusion; migraine headaches; and depression. R. 891. The ALJ found that Kennedy did not have an impairment or combination of impairments

that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

The ALJ then determined that Kennedy had the following residual functional capacity (RFC):

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift and or carry up to 20 pounds occasionally and 10 pounds frequently, and has no limitations in the total amount of time he is able to sit, stand or walk throughout an 8 hour workday. The claimant needs to alternate his position between sitting, standing, and walking for no more than five minutes out of every hour. While doing so, he would not need to be off task. The claimant can occasionally climb ramps and stairs, and he can occasionally stoop, kneel, balance, crouch and crawl, but he can never climb ladders, ropes or scaffolds. The claimant is unable to perform repetitive or extreme (greater than 75% of normal range of motion) neck flexion, rotation, or extension. He is not limited in his ability to perform such movements from 0-75 percent of normal ranges of motion. He can never reach overhead. He is not capable of working where he would be exposed to excessive noise or bright, flashing lights exceeding what is generally encountered in an office-type work environment. The claimant is limited to working in non-hazardous environments, i.e., no driving at work, operating moving machinery, working at unprotected heights or around exposed flames and unguarded large bodies of water, and he should avoid concentrated exposure to unguarded hazardous machinery. The claimant is further limited to simple, routine tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment. He is further precluded from work involving direct public service, in person or over the phone, although the claimant can tolerate brief and superficial interaction with the public, which is incidental to his primary job duties. He is unable to work in crowded, hectic environments. The claimant can tolerate brief and superficial interaction with supervisors and co-workers, but is not to engage in tandem tasks.

R. 894–95. The ALJ found that Kennedy was unable to perform any of his past relevant work. R. 905. Considering Kennedy's age, education, work experience, and RFC, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Kennedy can perform, such as assembler and inspector. R. 905–06. Based on these findings, the ALJ determined that Kennedy had not been under a disability from October 7, 2008, through the date

3

of the decision.  R. 906.  The Appeals Council denied Kennedy's request for review of the ALJ's decision, making that decision the final decision of the Commissioner.  R. 916.

## LEGAL STANDARD

The burden of proof in social security disability cases is on the claimant.  20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled.").  While a limited burden of demonstrating that other jobs exist in significant numbers in the national economy that the claimant can perform shifts to the SSA at the fifth step in the sequential process, the overall burden remains with the claimant.  20 C.F.R. § 404.1512(f).  This only makes sense, given the fact that the vast majority of people under retirement age are capable of performing the essential functions required for some subset of the myriad of jobs that exist in the national economy.  It also makes sense because, for many physical and mental impairments, objective evidence cannot distinguish those that render a person incapable of full-time work from those that make such employment merely more difficult.  Finally, placing the burden of proof on the claimant makes sense because many people may be inclined to seek the benefits that come with a finding of disability when better paying and somewhat attractive employment is not readily available.

The determination of whether a claimant has met this burden is entrusted to the Commissioner of Social Security.  Judicial review of the decisions of the Commissioner, like judicial review of all administrative agencies, is intended to be deferential.  *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).  The Social Security Act specifies that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  But the "substantial evidence" test is not intended to reverse the burden of proof.  In other words, a finding that the claimant is not disabled can also follow from a lack of convincing evidence.

4

Nor does the test require that the Commissioner cite conclusive evidence excluding any possibility that the claimant is unable to work. Such evidence, in the vast majority of cases that go to hearing, is seldom, if ever, available. Instead, the substantial evidence test is intended to ensure that the Commissioner's decision has a reasonable evidentiary basis. *Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) ("The substantial-evidence standard, however, asks whether the administrative decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record).").

The Supreme Court has reaffirmed that, "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Id.* "And whatever the meaning of 'substantial' in other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229). It means—and means only—"'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*

The ALJ must provide a "logical bridge" between the evidence and his or her conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). But it is not the job of a reviewing court to "reweigh evidence, resolve conflicts, decide questions of

5

credibility, or substitute [its] judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### A. RFC Assessment

Kennedy asserts that the ALJ's RFC assessment is not supported by substantial evidence. An RFC is an assessment describing the extent to which an individual's impairments may cause physical or mental limitations or restrictions that could affect his ability to work. SSR 96-8p, 1996 WL 374184, at *2. The RFC represents "the maximum a person can do—despite his limitations—on a 'regular and continuing basis,' which means roughly eight hours a day for five days a week." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (quoting SSR 96-8p). In forming the RFC, an ALJ must review all of the relevant evidence in the record and "consider all limitations that arise from medically determinable impairments." *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014).

Kennedy argues that the ALJ failed to explain how he incorporated Kennedy's moderate difficulties in concentration, persistence, and pace (CPP) into the RFC assessment. He asserts that

the ALJ violated the law of the case by failing to abide by the Court's remand order to connect Kennedy's specific limitations in CPP to the finding that Kennedy was limited to simple, routine tasks. On remand, the ALJ again limited Kennedy to "simple and routine work with no more than simple decision-making and judgment with only occasional and minor changes in the work setting." R. 902. But this time, the ALJ connected those limitations to Kennedy's limitations in CPP. He noted that he was imposing such restrictions to "accommodate [Kennedy's] allegations of poor concentration and difficulty handling changes in routine." *Id.* To address Kennedy's allegations that he had difficulty handling changes in routine, the ALJ limited Kennedy to only occasional and minor changes in his work setting. The ALJ discussed Kennedy's self-reported limitations, noting that Kennedy stated that he had problems with concentration and sometimes completing what he started, and was limited to concentrating for no more than 45 minutes at a time because of pain. R. 893. However, the ALJ went on to note that Kennedy had no difficulty understanding treatment recommendations, maintaining conversation, or attending and answering questions appropriately at the hearing. *Id.* He also discussed Kennedy's mental health examinations, which demonstrated "good attention and concentration" and "logical and coherent thought process." R. 899. The ALJ sufficiently articulated his reasoning. *See Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). Therefore, Kennedy is not entitled to remand on this basis.

Kennedy argues that the ALJ erred by failing to explain why he was limited in the quality of his interactions rather than the quantity. But the ALJ provided a thorough discussion of Kennedy's social difficulties. He recognized that, while Kennedy stated that he did not like to be around other people, Kennedy saw his family a few times per week, shopped at the store, attended doctor appointments, and had no difficulty interacting with individuals in a treatment setting. R. 893. To accommodate Kennedy's "allegations of difficulty interacting with others outside of

7

his family members," R. 902, the ALJ precluded Kennedy from "work involving direct public service, in person or over the phone." R. 895. The ALJ nevertheless indicated that Kennedy could "tolerate brief and superficial interaction with the public, which is incidental to his primary job duties." *Id.* Kennedy points to no evidence in the medical record to support the imposition of a limitation on the frequency of his interactions and instead only cites his own statement that he "did not like to be around people." Dkt. No. 12 at 16. The ALJ adequately discussed Kennedy's social anxiety and explained why he imposed the limitations he did. R. 893, 902.

Kennedy also argues that the ALJ erred in his assessment of his migraines. The ALJ stated that the evidence in the medical record did not support the severity or frequency of the headaches that Kennedy testified to at the hearing. R. 898. He noted that Kennedy's neurological examinations had been normal, prior MRIs and CT scans of Kennedy's brain showed no abnormalities, and Kennedy had been able to reduce his headaches with medication. *Id.* The ALJ observed that Kennedy complained of headaches but had varied frequency and improvement over the period of late 2015 through 2019. In October 2015, Kennedy reported to Dr. Ahjua that he had intermittent headaches but denied a medial branch block to assess the source of ongoing neck pain and headaches because he had "enough of needles." *Id.* Kennedy also reported greater than four headaches per month on occasion in March 2019 but admitted he was not taking any medications and wanted to try something. R. 898–99. By December 2017, Kennedy admitted to tapering his opioids to half on his own. Kennedy stated that his headaches were rare and exacerbated by neck movement, prolonged position, and lifting but not by prolonged sitting, standing, or bending. He rated the pain as moderate. R. 899. At a June 4, 2018 examination, Kennedy complained of neck pain but indicated his symptoms did not include headaches, and he stated in December 2018 that he had no more migraines. In May 2019, Kennedy's migraines were described as chronic without

8

aura and without status migrainosus and not intractable. Kennedy indicated in June 2019 that his headaches were not relieved by Imitrex. The ALJ found that Kennedy's headaches are intermittent and somewhat relieved by medication when taken. He concluded that Kennedy's headaches are accommodated by the limitation that he is not capable of working where he would be exposed to excessive noise or bright, flashing lights exceeding what is generally encountered in an office-type work environment. *Id.*

Kennedy does not point to any evidence in the record supporting greater restrictions than the ALJ imposed. Instead, he pulls at each thread of the ALJ's analysis, arguing that the ALJ should have reached a different conclusion. This is, in effect, an invitation for the Court to reweigh the evidence, which it cannot do. *Lopez*, 336 F.3d at 539. The ALJ's discussion of Kennedy's migraines included an analysis of the relevant evidence in the record, and the ALJ explained how that evidence supported his conclusion. R. 898–99. The ALJ provided a "logical bridge" between the evidence and his conclusion, and it is supported by the substantial evidence. *Clifford*, 227 F.3d at 872.

Next, Kennedy argues that the ALJ failed to explain how the evidence led him to conclude that Kennedy could never reach overhead and was incapable of performing repetitive or extreme neck flexion, rotation, or extension. He also claims that the ALJ overlooked various complaints of pain and reduced strength in his upper extremities and hands, and therefore failed to include any limitation regarding Kennedy's use of his hands for handling and/or fingering. But the ALJ acknowledged the evidence of Kennedy's reduced strength in his upper extremities, a lack of grip strength, and pain radiating throughout his upper extremities. R. 896–98. The ALJ's decision to not include a limitation on handling or fingering is supported by the substantial evidence. The ALJ extensively addressed the records relating to Kennedy's neck, back, and shoulders as well as

9

Kennedy's alleged pain "liberally," and concluded that the limitations imposed "more than adequately" accommodated Kennedy's pain. R. 897–98. The ALJ's imposed limitations went beyond the opinions of many physicians of record, as Dr. Ahuja, Dr. Kenney, and Dr. Gotanco all declined to impose reaching or manipulative limitations. R. 166–67, 180–81, 812. Kennedy fails to identify any additional limitations that would be appropriate based on the medical evidence. Instead, he points to his own subjective statements to support his position that the ALJ should have reached a different conclusion. While it is true that some evidence in the record, including Kennedy's statements, could be construed as favorable to him, the ALJ appropriately weighed the evidence in reaching his conclusions. *See Gedatus v. Saul*, 994 F.3d 893, 901 (7th Cir. 2021). The ALJ's RFC findings with respect to Kennedy's ability to reach overhead and engage in neck flexion, rotation, or extension are supported by substantial evidence.

Kennedy also asserts that the ALJ erred when he concluded that Kennedy's need to lay down up to three times per day was a "personal lifestyle choice and is not necessitated by any impairment or prescribed medication documented in the evidence of record." R. 904. He argues that he did not lay down simply because he felt like it but instead as a result of significant pain, his migraines, and his anxiety and depression. Kennedy further contends that his own statements in the record reflect that his medication caused him to become drowsy. R. 352, 933. The ALJ noted that Kennedy's "testimony, subjective complaints, and limitations are simply not consistent over time and [are] grossly disproportional to his activities and treatment in the record." R. 904. The ALJ stated that, while Kennedy indicated that he "lies down most of the day in pain," he nonetheless "performed some household chores, drives, goes out daily, spends time with family, shops in stores twice monthly, watches the news on the computer and reads." *Id.* These were adequate reasons to discount Kennedy's subjective complaints. *See Gedatus*, 994 F.3d at 901.

### B. Kennedy's Subjective Statements

Kennedy argues that the ALJ erred in his analysis of his subjective statements. When assessing an ALJ's credibility determination, the Court is to examine whether "the ALJ's determination was reasoned and supported." *Elder*, 529 F.3d at 413. "It is only when the ALJ's determination lacks any explanation or support" that the Court will declare it to be patently wrong, and thus, deserving of reversal. *Id.* at 413–14. Kennedy argues that the ALJ failed to explain how his daily activities are inconsistent with his need to lay down during the day. But the ALJ explained that, despite allegedly needing to lay down for significant periods of the day, Kennedy was still able to perform chores, drive, exit the house daily, spend time with family, and shop in stores. R. 904. The ALJ's determination on this issue is not "patently wrong." *Elder*, 529 F.3d at 413.

Kennedy further argues that the ALJ erred in finding him "generally unpersuasive" in appearance and demeanor while testifying at the hearing. R. 904. The ALJ stated that, while Kennedy "breathed hard" and teared up while testifying, "there were no other outward signs of debilitating pain during the hearing." *Id.* He emphasized that this observation was "only one among many relied upon in reaching a conclusion regarding the consistency" of Kennedy's allegations. *Id.* Kennedy argues that the ALJ pointed to no specific observation undermining any of his subjective reports. But central to Kennedy's claim of disability was the allegation that he was in significant pain throughout the day, so much so that he was required to lie down to alleviate that pain. Yet, as the ALJ noted, he saw no "outward signs of debilitating pain." *Id.* In short, remand is not warranted on this basis.

Kennedy also asserts that the ALJ did not consider his reasons for failing to pursue additional or recommended treatment, namely that he was unable to afford the medications. The

ALJ noted Kennedy's treatment had been "routine and/or conservative in nature," and that Kennedy had either stopped or refused to attend physical therapy sessions, only pursued pain medication for treatment of his neck pain, and failed to take any medications for allegedly disabling mental health symptoms. R. 904. The ALJ acknowledged that Kennedy reported he was unable to afford his treatment but noted that he made "no effort" to seek aid from a social service agency to help afford the medications. *Id.* While the ALJ's statement is somewhat inconsistent with the record because it appears that Kennedy obtained twelve months of financial assistance from a pharmaceutical company to help cover the costs of certain medications, R. 880, any error here was harmless. The Court can say with "great confidence" that the Agency would reinstate its decision on remand despite this error. *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). The ALJ's credibility determination with respect to treatment was just one in a myriad of reasons for reaching the ultimate conclusion that Kennedy was not disabled.

### C. Treating Source Opinions

Kennedy argues that the ALJ's decision to discount the opinions of several treating sources is not supported by substantial evidence. Generally, the ALJ must give "controlling weight" to the medical opinions of a treating physician on the nature and severity of an impairment if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with other substantial evidence." *Burmester*, 920 F.3d at 51. If the ALJ decides to give lesser weight to a treating physician's opinion, he must articulate "good reasons" for doing so. *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). "If the ALJ does not give the treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's

12

Case 2:20-cv-01925-WCG   Filed 09/12/22   Page 12 of 18   Document 23

specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

Kennedy begins by asserting that the ALJ erred in affording no weight to the opinion of Dr. Martin Baur, who opined that Kennedy was permanently disabled due to his musculoskeletal impairments. He contends that, considering the factors of 20 C.F.R. § 404.1527, Dr. Baur's opinion was entitled to greater weight. But the ALJ's decision is supported by substantial evidence. The ALJ explained that Dr. Baur's opinion was made before the relevant time period. He also noted that opinions regarding disability are reserved to the Commissioner and can never be entitled to controlling weight. The ALJ stated that Dr. Baur provided a summary of Kennedy's overall medical condition but did not provide supporting documentation or citation to the record or specific limitations, such as standing, walking or sitting. R. 903. Taken together, these were ample reasons to discount Dr. Baur's opinion, and the ALJ did not err in his determination. *See Ray v. Saul*, 861 F. App'x 102, 106 (7th Cir. 2021) (ALJ properly discounted opinion of physician where (1) the opinion was inconsistent with the record as a whole; (2) the physician's conclusions reflected final determinations of disability rather than objective medical evaluations; and (3) the opinion merely recounted subjective pain symptoms).

Next, Kennedy argues that the ALJ erred in affording Dr. Arvind Ahuja's opinion limited weight. Dr. Ahuja completed a Cervical Spine Questionnaire in January 2013. He found no limits on sitting, walking, or standing, except that Kennedy would need to get up and move around hourly. R. 809. He opined that Kennedy could frequently lift and carry 10 pounds, occasionally lift and carry 10 to 20 pounds, and never lift or carry over 20 pounds. *Id.* Dr. Ahuja noted that Kennedy was capable of tolerating low stress work. R. 811. He stated that Kennedy would need to take unscheduled breaks that lasted 15 minutes twice a day and would be absent from work

13

more than three times a month. R. 812–13. Dr. Ahuja opined that Kennedy could not push, pull, kneel, bend, or stoop. R. 813.

The ALJ afforded limited weight to Dr. Ahuja's opinion. He noted that, while the opinion was made prior to the relevant period of the decision, it provided an indication of Kennedy's level of functioning. R. 897. The ALJ explained that Dr. Ahuja's opinion is essentially consistent with the RFC. He objected to the opinion that Kennedy's impairments would cause greater than three absences each month and require two additional breaks a day to rest because there is no clinical evidence in the record that Kennedy's impairments would cause such a severe level of sustainability. The ALJ observed that Dr. Ahuja's examinations and diagnostic images only document mild findings, which Dr. Ahuja stated were stable. *Id.* He concluded that, while Kennedy's physical findings on examination and diagnostic images supported some limitation in range of motion and slight decrease in strength, they do not support further limitation than the light RFC, which Dr. Ahuja assessed. R. 903. Kennedy cites evidence that he believes supports Dr. Ahuja's finding on the issue, but that raises nothing more than a challenge to the way in which the ALJ weighed the evidence in the record and does not warrant remand. *See Gedatus*, 994 F.3d at 901. Kennedy also asserts that the ALJ erred by playing doctor, when he referred to a CT scan performed by Dr. Ahuja as "mild." R. 897. But the ALJ did not come to the term "mild" on his own—Dr. Ahuja himself noted that the CT scan revealed "mild ossification" and "mild degenerative changes." R. 703. The ALJ did not play doctor by summarizing Dr. Ahuja's findings.

Kennedy asserts that, even if the ALJ did not err in discounting Dr. Ahuja's opinion on that basis, he erred by failing to explain why he incorporated some of the limitations Dr. Ahuja recommended, but not others. For example, though Dr. Ahuja opined that Kennedy could never

14

bend, stoop, or kneel, R. 736, the ALJ concluded that he could occasionally stoop, kneel, balance, crouch, and crawl, R. 894. Even if the ALJ did not discuss each and every one of Dr. Ahuja's findings, such error is harmless. Kennedy argues that Dr. Ahuja's findings may support a finding that he is incapable of sustained neck position, and if imposed, he would be incapable of performing the assembler and inspector jobs. But the VE never testified that the assembler or inspector jobs required sustained neck position; instead, she stated that the jobs could be performed without turning the neck and that individuals in those jobs would be able to perform them without having to "flex their neck all the way back, all the way forward, or from one side to the other side." R. 956–57. The VE's testimony does not demonstrate that Kennedy would be precluded from performing these jobs with this neck position restriction. Kennedy also fails to describe how the other restrictions he identified would have an impact on the ultimate outcome. He merely identifies restrictions that the ALJ could have imposed but makes no effort to demonstrate how it would have altered the ALJ's decision.

Kennedy argues that the ALJ erred in his assessment of the opinion of his therapist, Barbara L. Mehnert, LLPC. Mehnert completed a mental impairment questionnaire on August 21, 2015. She opined that Kennedy was seriously limited in his ability to understand and remember detailed instructions and to carry out detailed instructions. She also found that he was limited in his ability to set realistic goals or make plans independently of others, to deal with stress of semiskilled and skilled work, and to travel in unfamiliar places. R. 796. Mehnert indicated that Kennedy had extreme limitation in activities of daily living and in maintaining social functioning; had marked limitation in maintaining concentration, persistence, or pace; and would have one or two episodes of decompensation within a 12-month period. R. 797. She stated that Kennedy would be absent from work more than four days per month. R. 798.

The ALJ indicated that, while Mehnert's progress notes support that Kennedy's depression caused some limitation in his social functioning and concentration, persistence, and pace, the evidence does not support the marked and extreme limitation and inability to sustain any work activity set forth in her opinions. R. 901. He explained that Kennedy's treatment has been conservative and somewhat inconsistent. He observed that there are gaps in the treatment record since he began in 2013 and that Kennedy admitted on several occasions that he had not been taking his medication as prescribed, which appeared to have a direct effect on his level of depression. The ALJ noted that, when taking his medication, Kennedy indicated his overall functioning had improved. *Id.*

Kennedy argues that the ALJ failed to consider the relevant regulatory factors, and that, if considered, they would have led to the ALJ affording greater weight to Mehnert's opinion. But again, the ALJ's discrediting of Mehnert's opinion is supported by the substantial evidence. Singling out the ALJ's decision with respect to Mehnert ignores the otherwise extensive discussion the ALJ undertook with respect to Kennedy's mental health. The ALJ noted that Kennedy had a Global Assessment in Functioning score of 52, which indicated "moderate" mental health symptoms. R. 899. He discussed mental status examinations that demonstrated depressed mood and flat affect but otherwise "good attention and concentration, logical and coherent thought processes and intact memory." *Id.* Records from Dr. Ahuja in September 2016 noted that Kennedy was not exhibiting any psychological symptoms. R. 901. Further medical records from Dr. Ahuja in 2017 and 2018 revealed no anxiety or depression. *Id.* Records from Lake Geneva wellness center in 2019 "revealed calm mood and affect." R. 902. This is just a short sample of the ALJ's thorough discussion of the record. R. 899–902. In short, the ALJ's discrediting of Mehnert's opinion as inconsistent with the record is supported by the substantial evidence.

### D. The ALJ's Decision at Step Five

Kennedy argues that the ALJ failed to resolve inconsistencies between the Dictionary of Occupational Titles (DOT) and the VE's testimony. The VE concluded that Kennedy would be able to perform the requirements of representative occupations such as assembler and inspector. R. 906. Kennedy maintains that the assembler and inspector positions exceed the ALJ's assessed limitation that he work in an environment without excessive noise. He also asserts that the assembler position requires the use of portable power tools and work as a member of an assembly group, which are inconsistent with the ALJ's limitation of no work in hazardous environments or around moving machinery and work that involves no tandem tasks. R. 894–85. In addition, Kennedy argues that, while both the assembler and inspector jobs require frequent reaching, the DOT does not break down directions of reaching, thus making the VE's testimony potentially inconsistent with the ALJ's limitation to no overhead reaching. *Id.*

Social Security Ruling 00-4p requires the ALJ to "inquire, on the record," as to whether the VE's testimony is "consistent with the occupational information supplied by the DOT." SSR 00-4p, 2000 WL 1898704, at *2. Where there is an apparent unresolved conflict between VE evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE evidence to support a determination or decision about whether the claimant is disabled. *Id.* Kennedy did not identify any purported conflicts during the hearing. As a result, he must demonstrate that "the conflicts were obvious enough that the ALJ should have picked up on them without any assistance." *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008) (noting that "SSR 00-4p requires only that the ALJ investigate and resolve *apparent* conflicts between the VE's evidence and the DOT"). Kennedy fails to make such a showing here.

Kennedy asserts that the ALJ should have picked up on the apparent conflict between the assembler job, which has a "loud" work environment, and the RFC limitation that Kennedy cannot work in an environment with excessive noise exceeding what is generally found in an office-type work environment. Any error in this respect is harmless, however, because Kennedy would be able to perform the inspector job. Kennedy contends that, while the inspector job carries a "moderate" noise level, the noise level of an office environment "may not be uniform." Dkt. No. 12 at 31. But if the noise level of an office-environment may fluctuate into "moderate" territory, as Kennedy acknowledges it does, Dkt. No. 22 at 15, then there can be no inconsistency between the assessed RFC and inspector job. As a result, any conflict between the RFC and inspector job was not apparent.

Kennedy also argues that there is a conflict between the VE's testimony that he could perform the inspector and assembler jobs while being limited to no overhead reaching despite the DOT's description of those jobs as involving frequent reaching. Because the DOT does not specify what direction of reaching is required for each job, the VE's testimony did not conflict with the DOT but merely supplemented it. *See Brown v. Colvin*, 845 F.3d 247, 254 (7th Cir. 2016) (holding that no conflict existed where the VE's testimony merely supplemented the DOT). Accordingly, remand is not warranted on this basis.

## CONCLUSION

For the foregoing reasons, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment in favor of the Commissioner.

**SO ORDERED** at Green Bay, Wisconsin this 12th day of September, 2022.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
